1

2

3                                                            O

4                                              NO JS-6

5

6

7

8                    UNITED STATES DISTRICT COURT

9                    CENTRAL DISTRICT OF CALIFORNIA

10

11   UNICHAPPELL MUSIC, INC., a    )   Case No. CV 14-02382 DDP (PLAx)
     Delaware corporation,          )
12                                  )   **ORDER RE: MOTIONS FOR SUMMARY**
                     Plaintiff,     )   **JUDGMENT**
13                                  )
          v.                        )   [Dkt. Nos. 67, 80, 81]
14                                  )
     MODROCK PRODUCTIONS, LLC,      )
15                                  )
                     Defendant.     )
16                                  )
     _____)
17

18        Presently before the Court are three Motions for Summary

19   Judgment:

20        (1) Counterdefendant Steven Winogradsky's Motion for Summary

21   Judgment (Dkt. No. 67);

22        (2) Plaintiff and Counterdefendant Unichappell Music, Inc.'s

23   and Counterdefendant Warner/Chappell Music, Inc.'s collective

24   Motion for Summary Judgment and Partial Summary Judgment (Dkt. No.

25   80); and

26        (3) Counterdefendant Winogradsky/Sobel's Motion for Partial

27   Summary Judgment (Dkt. No. 81).

28   ///

1   After considering the parties' submissions and hearing oral
2   argument, the Court adopts the following Order.

3   **I.   BACKGROUND**

4   This lawsuit arises from Defendant-Counterclaimant Modrock
5   Productions, LLC's ("Modrock") use of two songs in its musical
6   about 1960s British youth subcultures called "ModRock": The Kinks's
7   *Sunny Afternoon* and *Dedicated Follower of Fashion*, written by Ray
8   Davies.  Plaintiff Unichappell Music, Inc. ("Unichappell") filed a
9   copyright infringement lawsuit against Modrock based on Modrock's
10  use of the two songs in its musical production.  (Compl.)  Modrock
11  has denied infringement, alleged affirmative defenses, and
12  responded with counterclaims against Unichappell as well as
13  Warner/Chappell Music, Inc. ("Warner"); Steven Winogradsky
14  ("Winogradsky"); and Winogradsky/Sobel("W/S").  (Second Am. Answer
15  & Countercls. ("SAAC"), Dkt. No. 43.)

16  Warner is a music publisher that licenses rights to musical
17  compositions, including dramatic performance rights, or "grand
18  rights." (Dkt. No. 80-8, Statement of Uncontroverted Facts, Fact
19  No. 1, 4-5.)  Unichappell is a related corporation to Warner and
20  owns copyrights in musical works that Warner licenses, including
21  the Davies songs at issue here.  (Id.)  Steven Winogradsky is an
22  officer and shareholder of W/S as well as a California-licensed
23  attorney.  (SAAC ¶¶ 4-5.)  W/S is a California corporation that
24  does business in the music industry, primarily working on musical
25  rights clearance and licensing; Modrock contends that W/S is also a
26  law firm.  (SAAC ¶ 5.)

27  Warner has a standard grand rights request form that sets out
28  the generally required information for Warner to determine license

terms.  (Dkt. No. 80-8, Fact Nos. 4-5.)  Third parties, such as minority owners or songwriters, often have to be contacted for licensing approval in addition to Warner and Unichappell.  (<u>Id.</u> Fact Nos. 6-7.)  If any party disagrees with the use, then the license cannot be granted.  (<u>Id.</u>)  If approval is given, then usually a written quote is given to the requesting party, who can accept the provided terms or propose modifications; the quote is usually valid for ninety days.  (<u>Id.</u> Fact Nos. 8-9.)  According to Warner and Unichappell, "[t]he material terms set forth in a quote for a grand rights license include, *inter alia*, the duration of the license, the venues and territories of the proposed use, the nature and extent of the use, and the amount of the advance and the percentage of box office receipts to be paid to the licensor." (<u>Id.</u> Fact Nos. 10-11.)  A written long-form license can also be requested after the initial written quote is issued and accepted. (<u>Id.</u> Fact No. 13.)

Production development and music clearance for the musical "ModRock" first took place under a company called The Mods & Rockers Co. before its principal, Thomas Coleman, created a new company owned by his daughters and managed by himself called Modrock Productions in 2012.  (<u>Id.</u> Fact Nos. 56-61.)  Coleman hired an attorney, Gordon Firemark, to assist in getting the musical ready for commercial production.  (Opp'n, Dkt. No. 69, at 1-2 (citing Dkt. No. 69-1, Statement of Genuine Disputes of Material Fact ("SGD") at 62).)  Firemark recommended that Coleman hire Steven Winogradsky to assist Modrock in "clearing" the necessary music rights, which means obtaining permission to use the copyrighted music in the public performance of the musical.  (<u>Id.</u>

3

at 2 (citing SGD 63).)   Although disputed by Winogradsky, Coleman believed he was engaging Winogradsky "as a music attorney."   (Id. at 2 (citing SGD 64).)   Further, Coleman claims he was not aware that W/S was a corporation (and not a law firm) because there was no indication of its corporate nature, such as the use of "Corporation" or "Inc." in the firm's name, signature block, letterhead, marketing materials, website, or business cards.   (Id. at 3 (citing SGD 69-70).)

According to Modrock, all of the songs included in the musical "ModRock" "were an integral part of the Musical's character development and staging — including the design of costumes, sets, props and choreography, and were interwoven with the Musical's story."   (Id. at 1.)   Thus, for Modrock, the songs were "irreplaceable," including the two Davies songs discussed above. (Id. (citing SGD at 61).)   Winogradsky was informed that the musical needed to clear the rights to twenty specific songs and that Coleman would not invest time or expense in the musical until all twenty songs' grand rights were obtained.   (Id. (citing SGD 65-66).)   In September 2011, Modrock entered into a contract with W/S for W/S to clear the rights for the twenty songs to use in the musical, including the two Davies songs at issue in this suit. (Id. at 2 (citing SGD 65-68).)   Modrock would pay W/S based on the clearance of rights W/S was able to achieve.   (Dkt. No. 67, Mot. Summ. J., at 5.)

At W/S, Winogradsky gave the Modrock project to another employee, Dan Kirkpatrick.   (Id. at 6 (citing Dkt. No. 67-1, Separate Statement of Uncontroverted Facts ("SS"), at 44).) Kirkpatrick reported to Winogradsky on his progress clearing the

1 │ songs over time, but in spring 2013, it became known that the
2 │ rights to two Davies songs would not clear and Winogradsky became
3 │ personally involved.  (Id. (citing SS 45, 47).)  Kirkpatrick was
4 │ also the primary communicator with Modrock at W/S.  (Id.)

5 │     Before the problems arose in 2013, Warner/Chappell's employee,
6 │ Winifred Jow, had email correspondence with Kirkpatrick regarding
7 │ the songs and made statements in October and December 2011 such as,
8 │ "At first glance I don't see any major problems with these songs,"
9 │ and "Likely won't be a problem, I'm just awaiting the licensing
10 │ terms from you."  (Id. (citing SS 48, 49).)[1]  In December 2011,
11 │ Kirkpatrick spoke about licensing terms with Jow, and reported his
12 │ progress to Winogradsky, stating that Warner would not hold up the
13 │ show based on the music rights.  (Id. (citing SS 50).)  But in
14 │ April 2013, Kirkpatrick encountered problems with obtaining the
15 │ actual licenses to the Davies songs and sent an email to
16 │ Winogradsky stating, "Warner never sent us a quote, because Winnie
17 │ [Jow] said they never quote until the show [is] being staged, but
18 │ [she] assured us many times that when we were ready she would issue
19 │ [a] license, no problem."  (Id. at 6-7 (citing SS 51).)[2]

---

[1]     The emails provided in full: "Hi Dan, At first glance I don't see any major problems with these songs.  I understand this can be a bit of a chicken-and-the egg situation however our quotes are only good for 90 days and we don't normally grant in-principle approvals.  I'm happy to help you out but I can't grant an open ended quote.  Please give me a call if you wish to discuss further." (Dkt. No. 80-4, Anderson Decl., Ex. 12, email from Jow to Kirkpatrick on October 31, 2011); "Likely won't be a problem, I'm just awaiting the licensing terms from you." (Id., Ex. 14, email from Jow to Kirkpatrick on December 19, 2011).

[2]     See Dkt. No. 81-2, Winogradsky Decl., Ex. H for original email from Kirkpatrick to Winogradsky on April 11, 2013.

According to Unichappell and Warner, Jow had asked for more information from W/S regarding the grand rights licenses and W/S never provided that information, even after several back and forth communications between Jow and Kirkpatrick. (Dkt. No. 80-1 at 1; Dkt. No. 80-8, Fact. Nos. 19-28.) Further, Jow informed Kirkpatrick in her emails that her clearance would only be valid for ninety days: "At first glance I don't see any major problems with these songs, . . . our quotes are only good for 90 days and . . . I can't grant an open ended quote." (Dkt. No. 80-8, Fact No. 29.) Continued discussions between Jow and Kirkpatrick about these and other songs indicated that while clearance "[l]ikely won't be a problem," Jow was "just awaiting the licensing terms from [Kirkpatrick]," meaning that Jow still required more information about the uses before a grand rights license could be issued. (Id. Fact Nos. 33-40.) Kirkpatrick never provided Jow with this information and never responded to Jow's last December 19, 2011 email requesting it. (Id. Fact Nos. 40-41.) Jow marked the requests as abandoned in early 2012, after which she left her employment with Warner. (Id.) During this preliminary clearance process in 2011, Unichappell and Warner claim that Kirkpatrick was acting on behalf of The Mods & Rockers Co. and any provisional clearance would have been limited to that entity. (Id.)

Modrock claims that in March 2012 it received a status report from Kirkpatrick that had been reviewed and approved by Winogradsky. (Opp'n, Dkt. No. 69, at 3-4 (citing SGD 71).) This report listed the two Davies songs owned by Unichappell as being cleared, but noted that a minority owner of a different song had

1   denied clearance.  (Id. at 4 (citing SGD at 72).)[3]  Thus, the

2   musical was put on hold pending the clearance of that other song,

3   with both Firemark and Coleman informing Winogradsky of that

4   result.  (Id. (citing SGD at 73).)  Winogradsky personally worked

5   on clearing the rights with the minority owner and obtained the

6   rights on modified terms by June 2012.  (Id. (citing SGD 74-75).)[4]

7   Coleman then believed the rights to all twenty songs were cleared

8   and informed Winogradsky that Modrock would proceed with

9   development because all the rights had been cleared.  (Id. at 5

10  (citing SGD 76).)  However, Modrock claims that Winogradsky and

11  Kirkpatrick knew "as early as June[] 2012" that they had not

12  secured the rights to another Davies song owned by Sony/ATV, *Where

13  Are They Now*, because they did not have Davies's approval, but they

14  withheld this information from Coleman.  (Id. at 7 (citing SGD

15  87).)

16      In August 2012 and October 2012, the musical underwent a

17  "Table Reading" and a "Staged Reading," both of which involved

18  public performances of the twenty songs and both of which were

19  known to Winogradsky and Kirkpatrick.  (Id. (citing SGD 77-80).)

20  Modrock then went into full production mode, spending considerable

21  time and money to prepare the musical for its opening, including

22  contracting with theaters, hiring production staff and cast,

23

24

---

25      [3]   See also Dkt. No. 97, Supp. Decl. Mankey, Ex. S
26  (indicating the two songs as "approved" and "verbally approved" for
    all owners in a status report chart); Ex. T (same).

27      [4]   See also Dkt. No. 87-2, Coleman Decl., Ex. 4 (Winogradsky
28  negotiating clearance presenting himself as a lawyer ("Esq.") and
    referencing Modrock as his "client").

1    recording a cast album, and marketing and advertising the musical.
2    (Id. (citing SGD 81).)

3        In April 2013, a few months before the musical was set to open
4    in June 2013, Kirkpatrick contacted Warner again to obtain "formal
5    licenses" to use the four Warner songs it had inquired about in
6    2011.  (Dkt. No. 80-8, Fact No. 62.)  However, a new Warner
7    employee, Mitch Morgan, found that no quote had been issued in 2011
8    because Jow never received all the information she required and so
9    Morgan began processing Kirkpatrick's request for the first time.
10   (Id. Fact Nos. 65-59.)  Morgan was able to license two of the four
11   songs in April, but informed Kirkpatrick that Davies's approval was
12   required for licensing *Sunny Afternoon* and *Dedicated Follower of*
13   *Fashion*, so that until his approval was received, there was no
14   license to use those two songs.  (Id. Fact Nos. 70-75.)

15       Upon learning from Kirkpatrick that rights to the two
16   Unichappell Davies songs had not been cleared, Winogradsky became
17   personally involved in communications with Modrock and attempts to
18   clear the rights with Warner.  (Dkt. No. 67, at 7-8 (citing SS 54-
19   55).)[5]  Winogradsky claims that he never told Modrock or Coleman
20   that W/S had cleared the rights to the Davies songs.  (Id. at 7
21   (citing SS at 53).)  Instead, Winogradsky "expressly advised
22   Coleman and Modrock not to use the Davies Songs in the Musical" in
23   May and June 2013, after Winogradsky's attempts to clear the song
24   failed.  (Id. (citing SS at 54).)

25

26

27       [5]    See also Dkt. No. 81-2, Winogradsky Decl., Ex. H, email
28   from Kirkpatrick to Winogradsky ("As you know, Warner never sent us
     a quote . . . .").

This is in contradiction to what Coleman and Modrock claim occurred, which is that at no point were Modrock's public performances of the music or production of the musical using all twenty songs contested by Winogradsky and W/S as being unlicensed. (Opp'n, Dkt. No. 69, at 6 (citing SGD at 82-83).)  Only in May 2013 does Modrock acknowledge that Winogradsky informed it that Warner did not clear the licenses to the Davies songs.  (Id. (citing SGD 84).)  Modrock states that it was sent an email from W/S stating, "we were advised by our original contact at Warner Chappell that the songs were cleared and available for use in the show" but that Warner was now requiring Ray Davies's personal approval of the license, which they did not have.  (Id. at 6-7 (citing SGD 85).)

In May 2013, while awaiting final word from Davies regarding the use of his two songs, Winogradsky advised Coleman that Davies's songs should not be used and that Winogradsky could assist in clearing rights to other songs in lieu of the Davies songs.  (Dkt. No. 67 at 7-8 (citing 54-55).)  Winogradsky claims he wrote to Coleman, "I understand your desire to continue on the same course, but as Gordon has, I must advise against it," referring to Gordon Firemark, Modrock's production attorney.  (Id. at 7 (citing SS 54).)  But Coleman continued to refuse to replace the Davies songs.  (Id. (citing SS 55).)  After a telephone call at the end of May, Winogradsky sent another email to Coleman, stating that he advised against using the Davies songs in the musical and that, "As we are not your attorneys but engaged only as the music clearance company, I will leave it to your legal counsel to advise you of the

1  potential consequences of using the songs without approval." (Id.

2  (citing SS 54).)[6]

3      Modrock claims that during this time, Winogradsky was giving

4  Modrock mixed messages about the approval. (Opp'n, Dkt. No. 69, at

5  7-9.) Firemark had a phone conversation with Winogradsky at this

6  time, where Winogradsky allegedly said Warner was "in the wrong"

7  and that he would fix the issues. (Id. at 7 (citing SGD 88).)

8  Modrock further claims that Winogradsky said his emails to Coleman

9  about the Davies songs needing to be pulled from the show were

10 "just formalities" and that Winogradsky could obtain the rights to

11 use the songs for the show. (Id. at 7-8 (citing SGD 88-89).)

12 Coleman and Modrock went forward with the musical using the Davies

13 songs in its performance. (Id. at 8-9.) But Coleman had to inform

14 the musical's outside investor that he lacked the rights to some of

15 the songs, leading the investor to reduce his investment in the

16 show. (Id. at 8 (citing SGD 90).) Winogradsky, according to

17 Modrock, continued to represent that he would "fix" the situation

18 and get the licenses. (Id. at 8-9.) Thus, ModRock the musical

19 opened on June 19, 2013, and ran until July 14, 2013. (Id. at 9

20 (citing SGD 91).)

21     According to Modrock, it had the option to extend the show

22 based on its popular and critical success, but Coleman did not

23 extend the run because "it had accomplished what Coleman had

24 desired and an extension would have required significant extra

25 capital, but with the loss of [the investor's] additional funds

26 _____

27     [6]     During this time, Winogradsky held himself out as a
"music attorney" seeking approval to use the Davies songs. See
28 Dkt. No. 87-4, Blaha Decl., Ex. 11 at 67 (email referencing himself
as music attorney), 58 (deposition testimony).

1  this was not possible." (Id. at 9 (citing SGD 93).)   In August

2  2013, Modrock was informed that Davies would not reconsider his

3  denial to license the songs.  (Id. at 9 (citing SGD 94).)   This

4  refusal to license led to the musical's permanent discontinuance.

5  (Id. at 9-10 (citing SGD 94).)

6      According to Unichappell and Warner — and echoed by

7  Winogradsky and W/S — the musical was not a success.  They claim

8  the theatre was not full even when tickets were given away, the

9  musical "failed miserably at the box office[,] and closed three

10 weeks into it[s] scheduled twelve-week run." (Dkt. No. 80-1, Fact

11 Nos. 80-83.)  Modrock did send two checks to Warner as payment for

12 the four Warner songs it used, despite lacking approval for the two

13 Davies songs.  (Id. Fact Nos. 78-79.)  Warner deposited both checks

14 but claims the excess amount for the two unlicensed songs were used

15 as a partial offset against copyright infringement damages.  (Id.)

16     In March 2014, Unichappell filed this copyright infringement

17 lawsuit based on Modrock's use of the Davies songs without a

18 license.  (Compl.)  Modrock responded with counterclaims of its

19 own, as discussed above.  The present Motions for Summary Judgment

20 are filed by all counterclaimants as well as Plaintiff Unichappell

21 as to Modrock's affirmative defenses.

22 **II.  LEGAL STANDARD**

23     Summary judgment is appropriate where the pleadings,

24 depositions, answers to interrogatories, and admissions on file,

25 together with the affidavits, if any, show "that there is no

26 genuine dispute as to any material fact and the movant is entitled

27 to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A party

28 seeking summary judgment bears the initial burden of informing the

1  court of the basis for its motion and of identifying those portions

2  of the pleadings and discovery responses that demonstrate the

3  absence of a genuine issue of material fact.  See Celotex Corp. v.

4  Catrett, 477 U.S. 317, 323 (1986).  All reasonable inferences from

5  the evidence must be drawn in favor of the nonmoving party.  See

6  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 242 (1986).  If the

7  moving party does not bear the burden of proof at trial, it is

8  entitled to summary judgment if it can demonstrate that "there is

9  an absence of evidence to support the nonmoving party's case."

10  Celotex, 477 U.S. at 323.

11      Once the moving party meets its burden, the burden shifts to

12  the nonmoving party opposing the motion, who must "set forth

13  specific facts showing that there is a genuine issue for trial."

14  Anderson, 477 U.S. at 256.  Summary judgment is warranted if a

15  party "fails to make a showing sufficient to establish the

16  existence of an element essential to that party's case, and on

17  which that party will bear the burden of proof at trial."  Celotex,

18  477 U.S. at 322.  A genuine issue exists if "the evidence is such

19  that a reasonable jury could return a verdict for the nonmoving

20  party," and material facts are those "that might affect the outcome

21  of the suit under the governing law."  Anderson, 477 U.S. at 248.

22  There is no genuine issue of fact "[w]here the record taken as a

23  whole could not lead a rational trier of fact to find for the

24  nonmoving party."  Matsushita Elec. Indus. Co. v. Zenith Radio

25  Corp., 475 U.S. 574, 587 (1986).

26      It is not the court's task "to scour the record in search of a

27  genuine issue of triable fact."  Keenan v. Allan, 91 F.3d 1275,

28  1278 (9th Cir. 1996).  Counsel has an obligation to lay out their

support clearly.   <u>Carmen v. San Francisco Sch. Dist</u>., 237 F.3d

1026, 1031 (9th Cir. 2001).  The court "need not examine the entire

file for evidence establishing a genuine issue of fact, where the

evidence is not set forth in the opposition papers with adequate

references so that it could conveniently be found."   <u>Id.</u>

## III. DISCUSSION

### A.    Unichappell and Warner's Motion for Summary Judgment

Plaintiff and Counterdefendant Unichappell and

Counterdefendant Warner have (1) moved for summary judgment on the

three counterclaims Modrock makes against them, (2) moved for

partial summary judgment on several of Modrock's affirmative

defenses against Unichappell's copyright infringement suit, and (3)

in the alternative, moved for partial summary judgment on Modrock's

request for lost profits as damages in its counterclaims.  (Mot.

Summ. J., Dkt. No. 80.)  The three counterclaims are breach of oral

or implied contract, breach of implied covenant of good faith and

fair dealing, and negligent misrepresentation.

### 1.    Breach of Contract Counterclaim

Modrock claims that Warner and Unichappell breached an alleged

2011 oral or implied in fact contract conferring a nonexclusive

license to Modrock to use four songs, including the two Davies

songs at issue in Unichappell's copyright infringement suit.  (SAAC

¶¶ 62-65.)  Warner and Unichappell argue first that any alleged

license would be with Coleman's first company — The Mods & Rockers

Co. — and that such a license would not have been assignable to

Modrock Productions.  (Mot. Summ. J., Dkt. No. 80-1, at 11.)

Second, they claim that Jow did not have the authority to enter

into a contract for the Davies songs, or at least one beyond ninety days.  (Id. at 12. ) Lastly, they argue that required elements for a breach of contract claim are absent here.  (Id. at 12-17.)

Modrock responds that the licenses granted to The Mods & Rockers Co. were assignable to Modrock Productions because Modrock was merely a successor to The Mods & Rockers Co., and the same use and owner-manager was involved. (Opp'n, Dkt. No. 85, at 10). Second, Modrock claims there are genuine disputes of material fact regarding the formation of an oral contract. (Id. at 11-12.) Modrock argues that even if the emails between Kirkpatrick and Jow stated the quotes were only valid for ninety days, "Modrock must be allowed to argue to a jury that her conduct — failing to object to Kirkpatrick's statements that she had given him verbal approvals for the licenses (which both she and her successor Morgan admitted was a mistake; SGD 15, 95) — reasonably could be interpreted to mean that she had given him such approvals notwithstanding the supposed 90 day limitations." (Id. at 12.)  Modrock makes further arguments about the existence of a contract, such as promissory estoppel, course of conduct, and implied license. (Id. at 15 & n.5.)

"The elements of a claim for breach of contract are: (1) the existence of a contract, (2) performance by the plaintiff, (3) breach by the defendant, and (4) damage to plaintiff as a result of defendant's breach." Landstar Ranger, Inc. v. USA Logs., LLC, 725 F. Supp. 2d 916, 920 (C.D. Cal. 2010).  "A cause of action for breach of implied contract has the same elements as does a cause of action for breach of contract, except that the promise is not expressed in words but is implied from the promisor's conduct."

1  <u>Yari v. Producers Guild of Am., Inc.</u>, 161 Cal. App. 4th 172, 182

2  (2008).

3       The "ostensible authority of an agent cannot be based on the

4  agent's conduct alone; there must be evidence of conduct by the

5  principal which causes a third party reasonably to believe the

6  agent has authority." <u>Lindsay-Field v. Friendly</u>, 36 Cal. App. 4th

7  1728, 1734 (1995). "In the absence of showing ostensible

8  authority, persons dealing with an assumed agent are bound at their

9  peril to ascertain the extent of the agent's authority." <u>Id.</u>  The

10  knowledge of an agent is imputed to the principal. <u>O'Riordan v.</u>

11  <u>Fed. Kemper Life Assurance</u>, 36 Cal. 4th 281, 288 (2005).

12       Generally, licenses to copyrighted works are not transferrable

13  without the licensor expressly agreeing to it.  <u>See</u> <u>Gardner v.</u>

14  <u>Nike, Inc.</u>, 279 F.3d 774, 780-81 (9th Cir. 2002).

15       With these principles in mind, the Court holds that there is

16  no disputed fact that Jow disclosed to Modrock's agent,

17  Kirkpatrick, that she lacked authority to issue a quote valid for

18  more than ninety days. (Dkt. No. 80-8, Unichappell & Warner's

19  Statement of Uncontroverted Facts at Fact Nos. 29, 52-53; Dkt. No.

20  86, Modrock's Statement of Genuine Disputed Facts ("SGD") at 29,

21  38-39.)  As an agent of Modrock, Kirkpatrick's knowledge of this

22  fact is imputed to Modrock.  And further, Kirkpatrick admitted that

23  Jow never sent an email approving the license requests and issuing

24  a quote. (<u>Id.</u> Fact Nos. 47-48; Dkt. No. 81-2, Winogradsky Decl.,

25  Ex. H).)

26       While Kirkpatrick thought a conversation with Jow indicated

27  she would not "hold up" the show over licenses, all the written

28  emails between the two — including those after the spoken

conversation — indicate that Jow required more information that Kirkpatrick never provided and that Jow could not, and did not, issue a quote for longer than ninety days. (Mot. Summ. J., Dkt. No. 80, at 13 (citing Fact Nos. 34-35, 39-40); Opp'n, Dkt. No. 85, at 6.)

Modrock argues the agreement was to use the compositions any time up until September 2013, but Kirkpatrick admitted that he was told by Jow that any license would be valid for only ninety days in advance. (Mot. Summ. J., Dkt. No. 80, at 14). There is no evidence of any alleged agreement to use the songs until September 2013 in the record. Therefore, there was no contract, express or implied, when Modrock used the two Davies songs in 2013.

Modrock argues that Jow did not understand the grand rights license at issue here, which were for a "jukebox musical" and required long lead time request. (Opp'n, Dkt. No. 85 at 12-13; Dkt. No. 86, SGD at 114-115.) Modrock claims that Warner often grants quotes longer than ninety days, stating that it is the custom and practice of the industry for jukebox musicals. (Dkt. No. 86, SGD at 13, 114-115.) While it may be true that Warner and other publishers would give certain kinds of music uses longer quote times, there is no evidence that happened in this case. The testimonial and documentary evidence here establishes that — at most — any license Kirkpatrick received or thought he received from Jow was for ninety days. (See, e.g., Dkt. No. 80-3. Decl. Anderson, Ex. 3 163:10-18; 164:15-166:20; 167:15-20; 170:1-9; 185:22-25 (Depo. Kirkpatrick).) Therefore, the Motion for Summary Judgment is granted as to this counterclaim.

///

### 2.   Breach of Implied Covenant Counterclaim

Modrock, Warner, and Unichappell all agree that this counterclaim relies on the breach of contract claim.  (Mot. Summ. J., Dkt. No. 80, at 17; Opp'n, Dkt. No. 85, at 19; Reply, Dkt. No. 93, at 16-17.)  Because there was no contract, there was no breach of an implied covenant.  Therefore, the Motion for Summary Judgment is also granted as to this counterclaim.

### 3.   Negligent Misrepresentation Counterclaim

Modrock alleges a counterclaim for negligent misrepresentation based on Warner allegedly giving verbal approval of the song licenses in 2011 with Jow's representations, but that those representations were false, leading to the copyright infringement suit.  (SAAC ¶¶ 70-75.)  Warner and Unichappell argue that this cause of action is barred by California's economic loss rule and that Modrock cannot establish the elements of the claim because there was no affirmative misrepresentation.  (Mot. Summ. J., Dkt. No. 80, at 20-22.)

Modrock responds that it alleges negligent misrepresentation as an alternative cause of action.  The economic loss rule, it claims, does not apply because the contract and tort counterclaims do not have the same facts: "Modrock is contending . . . that if the approvals Jow gave Modrock in 2011 are not valid because Ray Davies had not signed off on them, Warner was negligent in not informing Modrock's agent Kirkpatrick of that fact."  (Opp'n, Dkt. No. 85, at 19-21.)  Further, Modrock argues, there was an affirmative misrepresentation in the sense of a "half truth" because Jow indicated that approval can and was given without mentioning the need to clear approvals with Davies.  (Id.)

1    The elements of negligent misrepresentation in California are:
2    "(1) the misrepresentation of a past or existing material fact; (2)
3    without reasonable ground for believing it to be true; (3) with
4    intent to induce another's reliance on the fact misrepresented; (4)
5    justifiable reliance on the misrepresentation; and (5) resulting
6    damage." Apollo Capital Fund, LLC v. Roth Capital Partners, LLC,
7    158 Cal. App. 4th 226, 243 (2007).  A "positive assertion" is
8    required for negligent misrepresentation.  Residential Capital LLC
9    v. Cal-Western Reconveyance Corp., 108 Cal. App. 4th 807, 828
10   (2003).  An implied representation or omission is not a sufficient
11   basis for a claim for negligent misrepresentation.  Id.
12       "The economic loss doctrine provides that certain economic
13   losses are properly remediable only in contract" and serves to
14   "maintain a distinction between damage remedies for breach of
15   contract and for tort."  UMG Recordings, Inc. v. Glob. Eagle
16   Entm't, Inc., 117 F. Supp. 3d 1092, 1103-06 (C.D. Cal. 2015)
17   (internal quotation omitted).  "Courts have also applied the
18   economic loss rule to bar negligent misrepresentation claims where
19   the purported negligent conduct is conceptually indistinct from a
20   contract breach".  Id. at 1105.
21       This counterclaim suffers from two defects.  First, the
22   economic loss rule appears to bar the claim.  Modrock alleges the
23   same underlying dispute in both claims: that there was an alleged
24   verbal license agreement with Jow's approval, but that such
25   approval was not valid because it lacked Davies's personal
26   approval.  This is at essence the same as Modrock's breach of
27   contract claim, where Modrock claims it had a verbal license
28   agreement that Warner and Unichappell failed to honor because they

1   lacked Davies's personal approval.  The economic loss rule bars

2   Modrock from failing on its contract theory and arguing the same

3   facts on a tort theory instead.

4       Second, and independent of the economic loss rule, it also

5   appears that there was no affirmative misrepresentation made, much

6   less "half truth."  Jow never told Kirkpatrick about the need to

7   clear approval with Davies because Kirkpatrick stopped responding

8   to her emails regarding the licenses, leading her to close the

9   files.  There was no partial truth provided to Kirkpatrick

10  intending to induce his reliance, and therefore there can be no

11  negligent misrepresentation cause of action.  W/S admits there was

12  no quote, much less a full license agreement, and it knew the

13  failure was not Jow's fault — an internal W/S email states that W/S

14  was trying to make the whole mix-up "look like [Jow's] fault."

15  (See Dkt. No. 80-4, Anderson Decl., Ex. 32, email from Winogradsky

16  to Kirkpatrick on May, 22, 2013.)[7]  None of Jow's statements,

17  _____

18      [7]    The full text of the email states:
    Danny:

19  More thoughts at 2:50 AM:

20  When you talk to Pat [of Warner], explain that you sent the
21  original request to Winnie [Jow] in Sept of 2011, as we know it
    takes many months for a stage show like this to be written, work-
22  shopped and rehearsed.  At that time, Winnie verbally told you that
    (whatever she told you) and that we should contact her again when
23  we ready to license.

24  Our client, confidently feeling that artists would want to be a
    part of his show, went ahead with including the songs based on
25  Winnie's "approval."  Had she not told us that the songs would be
    approved, we would have contacted her every couple of weeks to get
26  the approvals.  It seems that she never sent any requests out to
    the approval parties or else we would have gotten a written
27  approval or denial, neither of which was received.  Once the show
    was locked and booked into a theater for a mid-June 2013 release,
28  we contacted you in April for a license.  Now Mitch [of Warner] is
                                    (continued...)

including the more vague statements, could be taken as
misrepresentations.  Further, the SAAC does not allege that Jow
misrepresented that Davies's approval was needed in the SAAC's
statement of Modrock's claim of negligent misrepresentation against
Warner and Unichappell.  (SAAC ¶¶ 70-75.)  Therefore, there are no
grounds for a negligent misrepresentation counterclaim against
Warner and Unichappell, and the Motion is granted as to this
counterclaim as well.

### 4. Affirmative Defenses

#### (a) Estoppel

Modrock's Second Amended Answer states, "Plaintiff is estopped
from obtaining any relief against this Answering Defendant."  (SAAC
at 3, ¶ 6.)  Unichappell argues that there is no estoppel because
Modrock admitted that without a license, any use of the copyrighted
songs would be unlawful and there was no license when Modrock used
the songs in 2013.  (Mot. Summ. J., Dkt. No. 80, at 22-23.)
Plaintiff also argues that the SAAC lacks any factual pleading so

---

[7](...continued)
telling us that Ray Davies' approval parties say

"Unfortunately I have been advised that I will probably not be able
to get a response to this request until after 29th June."

**As much as I like Winnie, you need to throw her under the bus on
this and make it look like her fault.**  Not sure what I can add by
calling Pat that you can't do.  And let Mitch know you are calling
her.  See if Ron [Sobel of W/S] has any other ideas, including the
possibility of having to tell Tom [Coleman] that 3 of his songs,
all by Ray Davies, are not cleared 4 weeks before he opens..

Good Luck.

SW

(Dkt. No. 80-7, Ex. 32, email from Winogradsky to Dan Kirkpatrick
on May 22, 2013 (emphasis added).)

1   as to provide notice of what the defense is and how Plaintiff can

2   defend against it.   The Court notes that it is unclear what

3   Modrock's theory of estoppel is from the allegations in the Answer.

4   The mere fact that Modrock admitted in a discovery response that an

5   unlicensed performance of a copyrighted work would be unlawful is

6   not an admission that prevents Modrock from asserting an

7   affirmative defense.   (See also Opp'n, Dkt. No. 85, at 21-22.)   But

8   the lack of factual pleading of the affirmative defense is a ground

9   to strike the defense.   Further, there is no evidence that

10  Unichappell did anything that would estop it from bringing a

11  copyright infringement action.   Therefore, the Motion is granted as

12  to this defense.

13                    **(b)  Waiver**

14      Modrock's Answer states, "Plaintiff has waived any and all of

15  its claims against this Answering Defendant."   (SAAC at 3, ¶ 7.)

16  Unichappell argues that there is no lawful use of the songs without

17  a license and no evidence that Unichappell relinquished

18  intentionally its rights.   (Mot. Summ. J., Dkt. No. 80, at 23.)

19  Modrock makes the same arguments that it did not admit to an

20  unlawful use without a license and that material disputed facts

21  prevent summary judgment here.   (Opp'n, Dkt. No. 85, at 21-22.)

22  The Court holds that summary judgment is appropriate for this

23  defense because Modrock has alleged no facts to demonstrate that

24  Unichappell has relinquished its rights.

25                    **(c)  Innocent Infringement**

26      The innocent intent of a defendant is not a defense to

27  copyright infringement.   Monge v. Maya Magazines, 688 F.3d 1164,

28  1170 (9th Cir. 2012).   Further, evidence in the record demonstrates

1  that Modrock was informed by Warner, Firemark, and

2  Winogradsky/Sobel that its use of the two Davies songs would be

3  unauthorized and infringing, vitiating the claim of innocence.

4  Therefore, the Motion is granted as to this affirmative defense.

5

6                    **(d) Unclean Hands**

7       Modrock's Answer states, "Plaintiff is barred from obtaining

8  any relief against this Answering Defendant by the doctrine of

9  unclean hands." (SAAC at 4, ¶ 10.) Unichappell argues that there

10 is no evidence that Unichappell acted inequitably or that such

11 actions injured Modrock. (Mot. Summ. J., Dkt. No. 80, at 23-24

12 (citing Metro-Goldwyn-Myer Studios, Inc. v. Grokster, Ltd., 518 F.

13 Supp. 2d 1197, 1222-23 (C.D. Cal. 2007)).) Modrock makes the same

14 arguments as above and claims that there is evidence of

15 Unichappell's unclean hands in creating the confusion over

16 licensing through the actions of Jow, such as not checking for

17 third party approvals from Davies in 2011. (Opp'n, Dkt. No. 85, at

18 21-22.) The Court finds that the evidence described above shows no

19 material disputed facts to support Modrock's allegations of

20 inequitable conduct. It was not inequitable for Jow to fail to

21 seek Davies's personal approval when Kirkpatrick failed to provide

22 the information she requested, regardless of other situations where

23 Warner did process a quote without that information. Therefore,

24 the Motion is granted as to this defense.

25                  **(e) Oral and/or Implied License**

26      The Answer states, "Plaintiff granted this Answering Defendant

27 an oral and/or implied non-exclusive license for the enumerated use

28 of the Compositions, barring this action for Copyright

Infringement."  (SAAC at 4, ¶ 12.)  Unichappell argues this defense

is precluded by the arguments and evidence demonstrating that there

was no contract.  (Mot. Summ. J., Dkt. No. 80, at 24.)  The Court

agrees.  Since there is no evidence in the record that a license —

oral or implied — was in existence at 2013, this defense cannot

stand.  The Motion is granted as to this defense.

### (f) No liability for Doe Defendants

Modrock's Answer states, "This Answering Defendant is not

legally responsible for the acts and/or omissions of those

Defendants named herein as DOES 1 through 10, inclusive." (SAAC at

4, ¶ 13.)  Unichappell states that Modrock is only being sued for

its own infringing use of the songs in 2013.  (Mot. Summ. J., Dkt.

No. 80, at 24.)  The Complaint, however, alleges infringement

against Doe Defendants by and through Modrock's infringement.  To

the extent that Unichappell maintains those claims, then the

defense is valid.

### 5.  Partial Summary Judgment on Lost Profits

The Court does not reach Warner and Unichappell's argument

regarding lost profits damages for the counterclaims.  No

counterclaims against Warner and Unichappell remain based on the

Court's grant of summary judgment for Unichappell and Warner on all

the causes of action above.

### B.  Winogradsky's Motion for Summary Judgment

Winogradsky makes four main arguments in his Motion for

Summary Judgment: (1) there is no alter ego or personal liability

for Winogradsky based on actions of W/S; (2) Winogradsky is not

liable for breach of contract because he was not a party to the

contract between Modrock and W/S; (3) Winogradsky made no

affirmative misrepresentation to Modrock so as to be liable for a negligent misrepresentation claim; and (4) Winogradsky did not fail to meet the appropriate standard of skill, prudence, or diligence so as to be liable for professional negligence and breach of fiduciary duty.

### 1. Alter Ego and Personal Liability

"The alter ego doctrine arises when a plaintiff comes into court claiming that an opposing party is using the corporate form unjustly and in derogation of the plaintiff's interests. In certain circumstances the court will disregard the corporate entity and will hold the individual shareholders liable for the actions of the corporation." Nielson v. Union Bank of Cal., N.A., 290 F. Supp. 2d 1101, 1115 (C.D. Cal. 2003). The purpose of the alter ego doctrine is to avoid injustice when there is an abuse of the corporate privilege. Id. Only "exceptional circumstances" allow a court to disregard the corporate form and find liability as to the individuals underneath it. Leek v. Cooper, 194 Cal. App. 4th 399, 411 (2011). There is a large list of factors a court can consider when determining alter ego liability. Id. at 417-18. "An allegation that a person owns all of the corporate stock and makes all of the management decisions is insufficient to cause the court to disregard the corporate entity." Id. at 415.

"Corporate officers and directors cannot ordinarily be held personally liable for the acts or obligations of their corporations. However, they may become liable if they directly authorize or actively participate in wrongful or tortious conduct." Taylor-Rush v. Multitech Corp., 217 Cal. App. 3d 103, 113 (1990).

24

1     Winogradsky argues here that W/S is a corporation separate

2 from Winogradsky as an individual: "W/S has two shareholders,

3 directors and officers and several employees, it is and was

4 adequately capitalized, it observes corporate formalities, it does

5 not com[m]ingle funds or assets with Winogradsky, does not pay

6 Winogradsky's personal expenses, it does not conduct business for

7 Winogradsky, it has other employees, and Winogradsky has never

8 represented that he is personally responsible for the debts of

9 W/S." (Mot. Summ. J., Dkt. No. 67, at 19 (citing Statement of

10 Uncontroverted Facts ("SS"), Dkt. No. 67-1, at 2, 6-36).)

11     Further, Winogradsky argues that he is not liable as a

12 corporate officer. (Id. at 19-21.)  He claims that there are no

13 facts to show that Winogradsky authorized or participated in

14 misstatements to Modrock about the status of clearing the songs or

15 in a breach of contract, or any other claim. (Id. at 20.)  To the

16 extent that there is any liability here, he argues, only W/S would

17 be liable.

18     Modrock claims that Winogradsky was practicing law through W/S

19 and W/S was not a professional corporation, so there can be no

20 corporate shield for liability. (Opp'n, Dkt. No. 69, at 22.)

21 Further, to the extent W/S is a professional corporation, Modrock

22 claims that W/S has no professional liability insurance and no

23 security for the two lawyers practicing in it, which are required

24 by law. (Id.)

25     Modrock also claims there are material fact disputes over

26 several alter ego factors, such as: "(1) Winogradsky had the final

27 say over W/S's business activities, SGD 11; (2) W/S did not conduct

28 board meetings, SGD 100; (3) [w]hether W/S was adequately

capitalized (footnote omitted); (4) Winogradsky's active
concealment of the fact that W/S was a corporation; (5) [t]he use
of the same office for Winogradsky's law practice and W/S business
activities, SGD 101; and (6) [t]he use of a corporation as a mere
shell, instrumentality, or conduit for a single venture or the
business of an individual or another corporation — inter alia, the
fact that Mr. Winogradsky practiced law through W/S and did not
have a separate law corporation supports this finding." (Id. at
23-24.)

Modrock argues there is also personal liability based on
Winogradsky's authorization of Kirkpatrick's misrepresentations
regarding the status of clearing songs for the musical, and for
Winogradsky's own performance in attempting to clear the songs.
(Id.)

The Court finds that the parties' arguments demonstrate that
there are material factual disputes over several key factors that
relate to whether W/S was an alter ego of Winogradsky the
individual. See Leek, 194 Cal. App. 4th at 418 ("Whether a party
is liable under an alter ego theory is a question of fact."). 
Winogradsky points to several factors to show that he is not an
alter ego; Modrock points to evidence of other factors that show
that W/S may be an alter ego.  The Court cannot weigh the evidence
at a motion for summary judgment, and to the extent that there is a
question, it is to the nonmoving party's benefit.  Here, there are
genuine questions as to whether Winogradsky complied with the
corporate form so as to receive the benefit of a shield from
personal liability.

///

1     Additionally, there may be personal liability for Winogradsky

2     based on his active participation in and authorization of

3     Kirkpatrick's alleged wrongful conduct.  Winogradsky also

4     personally acted to obtain clearances for Modrock, and he can be

5     held liable for his own actions.  Therefore, the Motion for Summary

6     Judgment is denied as to alter ego and personal liability.

7          **2.   Breach of Contract and Implied Covenant**

8     Winogradsky argues that any contract at issue here was between

9     Modrock and W/S, not Winogradsky.  (Mot. Summ. J., Dkt. No. 67, at

10    10-11.)  Modrock responds that there are genuine disputes of

11    material fact over whether Modrock was contracting with W/S as a

12    corporation or with Winogradsky personally, particularly as Modrock

13    had not realized W/S was a corporation until attempts at settlement

14    were made.  (Opp'n, Dkt. No. 69, at 10-12.)

15    Because it is unclear whether W/S was acting on Winogradsky's

16    behalf through an alter ego theory, or if W/S was the known

17    contracting party as a corporate entity separate from Winogradsky,

18    the Court cannot grant summary judgment on this claim.  Modrock

19    raises factual disputes over the alter ego theory and over the

20    disclosures made at the time of the contract as to whether Modrock

21    knew it was contracting with Winogradsky or with a legally separate

22    entity, W/S.  To the extent that W/S is an alter ego of

23    Winogradsky, Winogradsky would be personally liable on the breach

24    of contract claim.  Therefore, the Motion is denied as to this

25    counterclaim.

26          **3.   Negligent Misrepresentation**

27    The elements of a negligent misrepresentation claim were given

28    above.  Even if a defendant makes false statements, if the

1 | defendant honestly and reasonably believes the statements to be
2 | true, then the misrepresentation is innocent and there is no tort
3 | liability for negligent misrepresentation.  <u>Residential Capital</u>,
4 | 108 Cal. App. 4th at 827.

5 |     Winogradsky argues that there is no evidence that he made a
6 | negligent misrepresentation to Modrock regarding the song rights
7 | clearances.  (Mot. Summ. J., Dkt. No. 67, at 11-12.)  He argues
8 | that Kirkpatrick was the communicator with Modrock until
9 | Winogradsky learned there were issues with the Davies songs.  (<u>Id.</u>)
10 | Further, to the extent that any misrepresentations were made,
11 | Winogradsky claims he made the statements honestly and reasonably
12 | believing them to be true; namely, that the songs were cleared or
13 | that he could obtain clearance.  (<u>Id.</u>)  Lastly, Winogradsky argues
14 | that there is no evidence that he intended to induce Modrock's
15 | reliance by making the misrepresentations.  (<u>Id.</u>)

16 |     Modrock responds by pointing to Coleman's testimony that
17 | Winogradsky represented to him and Firemark several times that all
18 | twenty songs were cleared.  (Opp'n, Dkt. No. 69, at 13 (citing SGD
19 | 53, 71, 74).)  And to the extent that Kirkpatrick was the primary
20 | communicator, Modrock claims that Winogradsky was acting as a
21 | supervising attorney or at least supervisor with authority, making
22 | him personally liable for the misrepresentations Kirkpatrick made.
23 | (<u>Id.</u> at 14.)  Further, Modrock claims that Winogradsky negligently
24 | misrepresented to Coleman that Winogradsky could obtain licenses to
25 | use the Davies songs even after they all learned that Davies had to
26 | approve the use first.  (<u>Id.</u> at 13.)  Modrock argues that this
27 | implied Winogradsky had knowledge of facts unknown to Modrock and
28 | made Winogradsky's prediction of success probable.  (<u>Id.</u>)  Lastly,

1  Modrock disputes that there could be no intent to induce reliance

2  because Winogradsky and W/S were hired to obtain licenses for the

3  songs and they all knew that Modrock was acting in reliance on

4  their representations as to the license clearance. (Id. at 15-16.)

5       The evidence does not disclose any formal instance of

6  Winogradsky personally making a misrepresentation to Coleman or

7  Modrock regarding the status of the song clearance.  The only

8  evidence would be Coleman's testimony that Winogradsky was sending

9  Coleman emails warning Coleman that Modrock should not use the

10 Davies songs because they did not have the rights to use them, but

11 at the same time, Winogradsky was orally telling Coleman that he

12 would get the licenses and that the emails were merely a formality.

13 (See, e.g., (Dkt. No. 69-2, Decl. Coleman, ¶¶ 37-45.)  Such

14 statements are neither plausible nor justifiably relied on,

15 particularly where Coleman had retained counsel for Modrock with

16 Firemark, and Firemark also told Coleman that using the songs would

17 render Modrock liable for copyright infringement. (See Dkt. No. 67-

18 6, Decl. Mankey, Ex. S (Depo. Firemark).)

19      The only liability reasonably plausible under the facts in the

20 record would be if Winogradsky were personally liable for the torts

21 committed by W/S and its agents, such as Kirkpatrick, because W/S

22 is an alter ego of Winogradsky or because Winogradsky authorized or

23 personally participated in Kirkpatrick's negligent

24 misrepresentation.  There are questions of fact regarding the

25 honesty and reasonableness of W/S's statements about music

26 clearance from 2011 to 2013.  Therefore, that theory of negligent

27 misrepresentation against Winogradsky individually survives this

28 Motion for Summary Judgment.

**4.   Professional Negligence and Breach of Fiduciary Duty**

The elements of professional negligence are "(1) the existence of the duty of the professional to use such skill, prudence, and diligence as other members of the profession commonly possess and exercise; (2) breach of that duty; (3) a casual connection between the negligent conduct and the resulting injury; and (4) actual loss or damage resulting from the professional negligence." Oasis West Realty, LLC v. Goldman, 51 Cal. 4th 811, 821 (2011).

The elements of breach of fiduciary duty are "(1) existence of fiduciary relationship; (2) breach of the fiduciary duty; and (3) damage proximately caused by that breach." Castaneda v. Saxon Mortg. Servs., Inc., No. CIV 2:09-01124WBS DAD, 2010 WL 726903, at *6 (E.D. Cal. Feb. 26, 2010).

Winogradsky argues that ModRock cannot establish the second elements of either cause of action (breach of duty) because there is no evidence that Winogradsky failed to use the skill, prudence, and diligence as other members of the legal profession commonly possess and exercise. (Mot. Summ. J., Dkt. No. 67, at 13.) Winogradsky claims he delegated work to an experienced employee who gave regular updates on his progress and was following usual procedures. (Id.) And while causation is usually a question of fact for the jury, Winogradsky argues that any breach was not a substantial factor in causing Modrock's injuries. (Id. at 13-14.) Any losses associated with the musical had nothing to do with Winogradsky's failure to obtain clearance to use the Davies songs because the musical still used the songs, and Coleman never attempted to replace the songs as Winogradsky suggested. (Id.)

Modrock responds that Winogradsky is directly responsible for his own malpractice and breach of duty based on Kirkpatrick's acts as well as Winogradsky's own actions.  (Opp'n, Dkt. No. 69, at 16-17 (citing SGD 97-98).)  Modrock argues that Winogradsky admitted that his firm had some culpability in the licensing failure.  (<u>Id.</u> at 17 (citing SGD 87).)  Further, Modrock claims that the money spent to put on the musical — $800,000 — was only spent when Modrock was told that all twenty songs were cleared, so the breaches of Winogradsky and his agent Kirkpatrick caused Modrock's damages.  (<u>Id.</u> at 17-18 (citing SGD 76-83).)

In his Reply, Winogradsky argues that Modrock cannot establish a claim for breach of professional negligence because Modrock has no expert witness to establish the standard of care.  (Reply, Dkt. No. 70, at 11-12.)

"Proof of professional negligence requires expert testimony as to the standard of care in the relevant community, unless defendant's negligence is so clear that a trier of fact may find professional negligence unassisted by expert testimony."  <u>FDIC v. Baker</u>, No. SA CV89-386AHS, 1991 WL 329757, at *6 (C.D. Cal. Jan. 23, 1991); <u>see also</u> <u>Goebel v. Lauderdale</u>, 214 Cal. App. 3d 1502, 1508 (1989).

Here, Modrock does not have an expert to establish the applicable duty of care for a lawyer.  However, an expert is not needed to set out the standard of care applicable here and to opine as to whether such a standard was met by Winogradsky's conduct in this case.  This is a simple case of alleged negligence where the facts can be presented to the jury and the jury can decide whether there is negligence based on those facts without the need to

31

1  establish a specialist standard of care.  Further, there are

2  disputed questions of fact regarding Winogradsky's status as a

3  lawyer in this case.  Therefore, the Motion for Summary Judgment is

4  denied for this counterclaim.

5

6  **5.  Equitable Indemnity**

7  The elements for equitable indemnity are "(1) a showing of

8  fault on the part of the indemnitor and (2) resulting damages to

9  the indemnitee for which the indemnitor is contractually or

10  equitably responsible."  <u>Am. Licorice Co. v. Total Sweeteners,</u>

11  <u>Inc.</u>, No. C-13-1929 EMC, 2014 WL 892409, at *5 (N.D. Cal. Mar. 4,

12  2014)(internal quotation omitted).

13  Winogradsky argues that it would not be equitable for

14  Winogradsky to be liable to Modrock if Modrock was found liable for

15  copyright infringement because Winogradsky told Modrock to not use

16  the songs due to the threat of such infringement.  (Mot. Summ. J.,

17  Dkt. No. 67, at 15-16.)  Modrock chose to use the songs knowing

18  that there were no licenses and that an infringement suit was

19  likely.  (<u>Id.</u> at 16.)

20  Modrock responds that it did not choose to use the Davies

21  songs while knowing that there were no licenses.  (Opp'n, Dkt. No.

22  69, at 20.)  Instead, Modrock had no choice but to use the songs

23  because Coleman did not learn of the lack of rights until a few

24  weeks before the show was to open, and after $800,000 was spent

25  preparing the show for its opening.  (<u>Id.</u> at 20-21.)  And Coleman

26  decided to continue with the songs in the show because Winogradsky

27  privately represented to Coleman and Firemark that Winogradsky

28  could fix the clearances — despite his emails to the contrary — and

32

1  Modrock relied on those misrepresentations.  (<u>Id.</u> at 21 (citing SGD
2  88-89).)

3      In reply, Winogradsky argues that the alleged private
4  conversations between himself and Coleman about obtaining the
5  licenses while sending emails contradicting that information are
6  neither credible nor supported by the evidence.  (Reply, Dkt. No.
7  70, at 13 (citing SS at 54).)  And even if oral representations
8  were made, Winogradsky argues that Modrock was nevertheless on
9  notice about copyright infringement based on the undisputed
10 communications.  (<u>Id.</u>)

11     The Court finds that the alleged oral conversations between
12 Winogradsky and Coleman are neither supported by evidence nor
13 plausible, but there are still grounds for equitable indemnity in
14 this case.  Personal liability against Winogradsky would be
15 available based on the alter ego theory and the professional
16 negligence claim.  Winogradsky could be partially liable for
17 Modrock's decision to use the songs without authorization.
18 Therefore, the Motion is denied.

19     **C.  Winogradsky/Sobel's Motion for Summary Judgment**

20     W/S has three main arguments: (1) there was no negligent
21 misrepresentation because W/S honestly and reasonably believed any
22 misrepresentation made to Modrock; (2) Modrock's counterclaims for
23 professional negligence and breach of fiduciary duty fail because
24 W/S is not a law firm, Modrock lacks an expert to establish the
25 standard of care, and W/S did not cause any injury to Modrock; and
26 (3) equitable indemnity is not appropriate in this case because W/S
27 is not responsible for Modrock's decision to use the two Davies
28 songs.  (Mot. Summ. J., Dkt. No. 81.)

1

### 1.   Negligent Misrepresentation

2      W/S argues that Kirkpatrick was experienced and had an honest

3 and reasonable belief based on his interactions with Jow that the

4 song rights were cleared.  (Id. at 8-9.)  Winogradsky believed the

5 same based on Kirkpatrick's representations to him.  (Id.)

6 Therefore, there was no negligent misrepresentation made to

7 Modrock, much less one that was intended to induce Modrock's

8 reliance.  (Id.)

9      Modrock responds there is inconsistent deposition testimony

10 from Winogradsky regarding the firm's culpability from what it told

11 Modrock and the failures of Kirkpatrick in communicating with Jow

12 and Modrock about the clearance of the songs.  (Opp'n, Dkt. No. 87,

13 at 11-12.)  Further, Kirkpatrick's emails providing status updates

14 to Modrock on song clearance indicated that all twenty songs had

15 been cleared by 2012, when that was not the case and W/S knew it

16 was not the case.  Thus, Modrock argues that summary judgment is

17 inappropriate based on these facts.

18      In reply, W/S argues that the deposition testimony does

19 establish that W/S employees had honest and reasonable beliefs in

20 the truth of their statements to Modrock.  (Reply, Dkt. No. 92

21 (citing Supp. Mankey Decl. ¶ 3, Ex. R (24:22-25:24); Modrock Ex. 11

22 135:13-136:3; Modrock Ex. 11, 136:4-12, 293:9-10. Modrock Ex. 11,

23 283:2-6. Modrock Ex. 11 103:11-104:9).)  That the statements — the

24 representations that the songs were cleared — later turned out to

25 be mistaken does not mean that W/S lacked honest and reasonable

26 beliefs at the time the statements were made.  (Id.)

27      The Court finds that there are genuine disputes of material

28 facts regarding the honesty and reasonableness of the

misrepresentations made by W/S employees to Modrock concerning the clearance of the songs.  Besides the two Davies songs for which Modrock currently faces copyright infringement liability, it appears that W/S employees had clearance issues with other songs but represented to Modrock that they had cleared those songs when they had not.

While those songs were ultimately cleared, it appears that there were several instances of less than forthright communications between Kirkpatrick, Winogradsky, and Coleman.  As for the communications relating to the two Davies songs clearances, there are many disputed material facts as to the knowledge of the parties about the lack of clearance, the time that knowledge was gained, and what was communicated.  Therefore, the Motion for Summary Judgment is denied for this cause of action.

        **2.  Professional Negligence and Breach of Fiduciary Duty**

W/S argues here that first, Modrock cannot establish a breach of the standard of care because it has no expert by which to establish that standard.  (Mot. Summ. J., Dkt. No. 81, at 11.) Second, W/S argues that there was no attorney-client relationship and so it cannot be held liable as a law firm.  (Id.)  W/S argues that there was no formal engagement letter, the industry is usually not practiced by lawyers, the invoices made clear that a nonlawyer was doing the work for Modrock, and Modrock's own website distinguished between music clearance and legal services. (Id.) Third, W/S disputes that any breach here would have been a substantial factor in causing Modrock's injuries because Modrock used the Davies songs even after learning of the lack of authorization.  (Id.)  Further, W/S disputes the availability of

lost future profits in this case, particularly where Modrock failed
to disclose in discovery the source and support for its claimed $10
million in lost profits, as well as lacks an expert to establish
how that number was calculated.  (<u>Id.</u>)

Modrock argues that there is evidence that W/S failed to use
the skill appropriate in this situation, and that Winogradsky is
personally responsible for Kirkpatrick's acts as his agent and
because Winogradsky was a supervising attorney. (Opp'n, Dkt. No.
87.)  Modrock claims that Winogradsky testified that Kirkpatrick
failed to meet the standard of care here.  (<u>Id.</u> (citing SGD 49-
48).)  This establishes, Modrock argues, that there is clear
professional negligence here that a jury could find without the
need for experts.  (<u>Id.</u> at 14-15.)

Further, Modrock claims that W/S represented itself as a law
firm, with Winogradsky as a partner at the firm and as a music
attorney for Modrock.  (<u>Id.</u> at 15-16.)  To support its argument,
Modrock points out that the firms share the same name, operate out
of same address, and share a checking account.  (<u>Id.</u>)  Further,
Modrock thought it was retaining a law firm based on the
representations and actions of Winogradsky at the time of
engagement.  (<u>Id.</u>)  And even if Winogradsky was not acting as an
attorney, Modrock argues, he is held to the same standard of care
as an attorney even when he is acting in another capacity. (<u>Id.</u> at
16.)

Modrock also claims that the lost profits calculation argument
was not raised at the parties' meet and confer conference and so
the Court should not allowed it to be argued in this Motion.  (<u>Id.</u>)
Further, Modrock argues it did disclose how it calculated $800,000

in reliance damages and lost profits of $10 million.  No document

requests or interrogatories were ever served on Modrock about the

damages, but Coleman was questioned at his deposition about the

amount and Coleman answered as best he could.  (Id. at 19 (citing

SGD 47; Coleman Decl. ¶ 46; Blaha Decl. ¶ 8).)  According to

Modrock, the lost profits here are not too speculative because they

were based on Coleman's experience in the field, the projections of

the musical's performance, and the experience of similar projects.

(Id. at 19-20.)

Here, the lack of an expert as to the professional negligence

and breach of fiduciary duty standards of care does not prevent

these causes of action from going forward.  A jury could

potentially find negligence on the face of the facts presented

without the need for an expert to establish the standard of care.

Thus, the questions of fact regarding W/S's professional status and

potential negligence in song clearance are questions for the jury.

Therefore, the Motion for Summary Judgment is denied as to these

causes of action.

However, there is insufficient evidence to support Modrock's

damages claim to $10 million in lost profits.  There is no expert

to testify as to how these damages were calculated or why they are

appropriate in this case.  This case is not dealing with the sale

of known items; the subject of the claim is an artistic production

without a past record to support the prediction of future success.

As Coleman's deposition testimony makes clear, the claim to $10

million in lost profits is based on speculation, and Coleman is

neither disclosed or qualified as an expert nor relying on sound

1    methodology to calculate the future profits.  (Dkt. No. 87-2,

2    Coleman Decl. ¶¶ 46-47; Dkt. No. 87-3, Ex. 10.)

3         The deposition testimony demonstrates that Coleman lacked any

4    documentary evidence of the claim for $10 million and did not use

5    reliable methods and data to arrive at the number:

6    Q:   I want to know the basis on which you can in good
          faith claim that ModRock Productions lost $10 million
7         – excuse me – would have made $10 million in profits
          from the musical if it had obtained the rights to use
8         "Sunny Afternoon" and "Dedicated Follower of Fashion."

9         . . . .

10   A:   First of all, **the 10 million – and I believe it's 10
          and change – is not based on what it would have**
11        **earned.  It's based on what we think is a legitimate**
          **compensation for us.  We believe and we will have**
12        **testimony to back up, statistics to back up, that had**
          **we had the show we would have been able to progress**
13        **into productions eventually around the world.  And it**
          **would have been enormously successful and would have**
14        **returned significant value.**

15   Q:   In this action ModRock's initial disclosures do not
          include a calculation of lost profits or any damages
16        but claim lost profits of $10 million.  Do you have
          any information as to the calculation of that $10
17        million figure?

18   A:   You mean, what will go into 10 million or how did we
          arrive at 10 million?
19
     Q:   Well, including that, yes.  How did you arrive at 10
20        million?

21   A:   **We took a look at several comparable shows.  We did an**
          **evaluation of how it started, where it went, how it**
22        **progressed, and made an estimate as to the kind of**
          **earnings.  I then took that number and took roughly 10**
23        **percent.**

24   Q:   What were the several comparable shows that you looked
          at?
25
     A:   **The two shows that I looked most closely at were the**
26        **ones I had the most information on.  And they were**
          **both jukebox musicals.  "Jersey Boys" and "Rock of**
27        **Ages."**

28

38

1   Q:  When you say "we," who else besides you was involved
        in that analysis?
2
3   A:  Well, I consulted for a variety of times on a number
        of issues, not just this matter, with Norman Twain.
        Norman is a producer and a manager for Broadway shows.
4
5           I spoke to the Walnut Group, asked for some basic
        information on Jersey Boys.  And I spoke to . . .
        Hein, who was involved with Rock of Ages.
6
            . . . .
7
8   Q:  What did you mean when you said "an evaluation of how
        it started"?
9
    A:  Well, as you may or may not know, musicals have a long
        gestation period.  All my research, my personal
10      experience, points out that they go through a
        development phase.  You know, some of them have rough
11      starts, some of them don't.  But very few, unless they
        are a brand or Andrew Lloyd Webber, with huge
12      resources behind him, show up day one in New York.

13          For example, Jersey Boys, you know, was produced
        and did very poorly initially.  Second run was not so
14      great.  Took a while to find the right city, venue.

15          Rock of Ages took years.  Rock of Ages started as
        a review, getting bodies in, for example, by offering,
16      you know, you can bring your own booze and rock out to
        metal songs.
17
            So that's a consideration.  **I will say that
18      ModRock's first 22, 24 shows, compare extremely
        favorably to not only those two shows, to almost any
19      show.  So there is some method to the madness.  And
        certainly when we come to trial, I plan on having
20      quite a bit of testimony with this respect.**

21  Q:  This analysis that you are describing – was it all or
        in part in writing?
22
23  A:  Yeah, it was probably – a lot of information was
        written down, yes.

24  Q:  And has that been produced in this case?

25  A:  No.

26  Q:  Is there a reason why it wasn't produced?

27  A:  No longer exists.

28

1    Q:   So what do you mean it no longer exists?   You
          destroyed it?

2

3    A:   I do not have it.   I either threw it away or I don't
          have it.

4  (Dkt. No. 87-3, Ex. 10 at 24-29 (emphasis added).)   Picking two

5  extremely successful musicals, "Jersey Boys" and "Rock of Ages,"

6  and taking a rough estimate of 10% of their earnings is not a

7  reliable method of calculating future profits of a new production

8  that ran in North Hollywood for several weeks and was written by a

9  new playwright.   And a claim of lost profits must be based on

10 reliable estimates of future profits absent the defendant's

11 conduct, not what a party thinks is "legitimate compensation."

12 Nothing in the evidence presented here at summary judgment

13 demonstrates that Coleman could be certified as an expert or that

14 his testimony would be supported by reliable methods and data.

15     Further, as this deposition testimony establishes, Modrock

16 failed to disclose pursuant to Federal Rule of Civil Procedure

17 26(a)(1)(A)(iii) the calculation and support for the claim to $10

18 million in lost profits.   Modrock's argument that counsel for W/S,

19 Winogradsky, Unichappell, and Warner never served interrogatories,

20 requests for admission or production, or other discovery requests

21 does not change the fact that Modrock had an affirmative duty under

22 the Federal Rules to disclose the calculations.   Therefore, based

23 on the lack of sufficient evidence to establish the claim for lost

24 profits in this case, the Court holds that Modrock cannot present

25 evidence or seek damages of $10 million in profits against any

26 party.

27 ///

28 ///

### 3.   Equitable Indemnity

W/S argues that it would not be equitable for W/S to pay for Modrock's liability to Unichappell because W/S warned Modrock about copyright infringement and Modrock continued to use the songs. (Mot. Summ. J., Dkt. No. 81, at 15-16.)

As argued in Modrock's Opposition to Winogradsky's Motion for Summary Judgment, Modrock claims here that there would be no copyright infringement suit but for the negligence and misrepresentations of Winogradsky and W/S about song clearances. (Opp'n, Dkt. No. 87 at 21-22.)  Coleman only went forward with the musical because by the time he learned of the problems with the Davies songs, it was too late to replace the songs and too late to stop the musical, which he already had spent $800,000 on and scheduled to open in about a month.  (Id.)

The Court finds that there are material fact disputes underlying the conduct between W/S, its employees, and Modrock, and that these disputes will determine the equities in holding W/S liable for any infringement Modrock may have committed.  It is possible that but for the failures of W/S and its employees, Modrock may not have committed copyright infringement.  Therefore, this cause of action survives summary judgment.

## IV.   CONCLUSION

For all the reasons discussed above, the Court:

(1) DENIES in part and GRANTS in part Counterdefendant Steven Winogradsky's Motion for Summary Judgment (Dkt. No. 67);

(2) GRANTS Plaintiff and Counterdefendant Unichappell Music, Inc.'s and Counterdefendant Warner/Chappell Music, Inc.'s

1  collective Motion for Summary Judgment and Partial Summary Judgment

2  (Dkt. No. 80); and

3      (3) DENIES in part and GRANTS in part Counterdefendant

4  Winogradsky/Sobel's Motion for Partial Summary Judgment (Dkt. No.

5  81).

6  IT IS SO ORDERED.

7

8  Dated: March 16, 2016

9                                    DEAN D. PREGERSON
                                     United States District Judge